

09/30/2009

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| JIMMY D. CHAMBERS, | § | Case No. 07-42055 |
| | § | (Chapter 7) |
| Debtor. | § | |
| | § | |
| | § | |
| JIMMY CHAMBERS, MARY ANN | § | |
| CHAMBERS, and MARK WEISBART, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Adv. No. 07-4210 |
| | § | |
| FIRST UNITED BANK & TRUST CO., | § | |
| | § | |
| Defendants. | § | |

## <u>MEMORANDUM OPINION</u>

In this adversary proceeding, the Plaintiffs are seeking a free house. This proceeding is before the Court following a trial on a portion of the First Amended Complaint filed by the Plaintiffs. In particular, at the trial of this adversary proceeding, the Court heard evidence and argument regarding the validity of First United Bank & Trust Co.'s alleged lien on Jimmy and Mary Ann Chambers' spacious home and the surrounding real property, which Mr. Chambers valued at $700,000 in his bankruptcy schedules. This Memorandum Opinion embodies the Court's findings of fact and conclusions of law. *See* FED. R. BANKR. P. 7052.[1]

---

[1] To the extent any of the following findings of fact are construed as conclusions of law, they are hereby adopted as such. Likewise, to the extent any of the following conclusions of law are construed as findings of fact, they are hereby adopted as such.

# I. RELEVANT PROCEDURAL HISTORY

This adversary proceeding began as a petition filed by Jimmy and Mary Ann Chambers against the Defendant, among others, in Texas state court.  After Mr. Chambers filed a voluntary petition for relief under Chapter 13 of Title 11 of the United States Code (the "Bankruptcy Code"), he removed the state court action to this Court. Mr. Chambers subsequently converted his bankruptcy case to Chapter 7, and the Court appointed Mark Weisbart as the Chapter 7 trustee.  In this adversary proceeding, the Chapter 7 trustee sought and obtained authority to file a First Amended Complaint in which, among other amendments to the original complaint, the Chapter 7 trustee was added as a Plaintiff.

On December 14, 2007, the Defendant filed a motion requesting that this Court abstain and remand the entire action back to state court.  On February 12, 2008, following a contested hearing on the Defendant's motion, the Court entered an order regarding the Defendant's request.  The Court's order provided that, after determining the validity of the Defendant's alleged lien on Mr. Chambers' homestead, the Court would remand the remaining claims to state court.

On May 8, 9 and 20, 2008, the Court conducted a trial on the validity of the Defendant's lien on the Chambers' home and the surrounding real property.  Jimmy and Mary Ann Chambers testified in support of the First Amended Complaint.  In addition, the Defendant presented the testimony of Vaughn Andrus, Mary Ann Edelman and Tim Smith, among others.  At the conclusion of the parties' evidentiary presentations, the Court invited the Plaintiffs and the Defendant to submit their closing arguments in the form of briefs to the Court and took the matter under advisement.

2

## II. RELEVANT FACTUAL BACKGROUND

Jimmy and Mary Ann Chambers married in 1988.  They have four children, whose ages ranged from 15 to 35 at the time of trial.  They reside in a spacious home in Pilot Point, Texas, which consists of 6,142 square feet of living space and is situated in the approximate center of 3.27 acres of real property.  The 3.27 acres of real property includes all of Lots 25 and 26 of Scenic Acres Addition in Denton County, Texas.

Since their marriage, the Chambers have operated numerous businesses and have done business with a number of banks.  Mr. Chambers managed some real estate investments, among other things, and he testified that he has "borrowed lots of money" in connection with his businesses.  At one time, one of the Chambers' businesses, referred to by the parties as JIMAC, owned all or nearly all of the lots in Scenic Acres Addition.

Mrs. Chambers' father, Larry Harwell, transferred ownership of a business called Today's Signs to the Chambers after their marriage.  In 1996, the Chambers formed another business called Gravity Enterprises.  At around the same time, Mr. Chambers' father, Walter, formed the M&J Trust for the ostensible benefit of his four grandchildren. The M&J Trust, which consists of four separate trusts, held all the shares of Gravity Enterprises.  In addition, JIMAC conveyed all of Lots 25 and 26 to the M&J Trust in exchange for nominal consideration.

The Chambers began doing business with the Defendant's predecessor-in-interest, Farmers & Merchant State Bank ("FMSB"), in 1988.  Over the years, the Chambers developed a personal, friendly relationship with Marianne Edelman, an FMSB employee who assisted Vaughn Andrus.  The Chambers also developed a personal friendship with Mr. Andrus, who was employed as the Chairman and CEO of FMSB.

3

Mr. Andrus served as the trustee for the M&J Trust from its inception and, under the terms of the Trust Agreement, had the sole power to appoint a successor in the event he should fail or cease to act as the trustee for the M&J Trust. Mr. Andrus' good faith was "conclusively presumed" under the Trust Agreement. Section 2.0.1 of the Trust Agreement addressed the distribution of corpus and income from the trust estate as follows:

> The Trustees [sic] may accumulate or retain income from the Trust Estate, in whole or in part, and from time to time, distribute or pay to or for any then beneficiary thereof such amounts of income or corpus, including the total amounts of such income and/or corpus, as the Trustee deems advisable.

The Trust Agreement granted Mr. Andrus "broad and unlimited powers" in addition to the powers and privileges specified in the Trust Agreement.

Gravity Enterprises was one of FMSB's largest customers. FMSB allowed large overdrafts of up to $200,000 on Gravity Enterprise's account. Mr. Andrus approved these overdrafts as they occurred. Mr. Chambers testified that the overdrafts effectively served as unsecured lines of credit from FMSB.

In addition to extending credit to Gravity Enterprises, FMSB loaned money to another business owned by the Chambers, which was referred to by the parties in this proceeding as SMLA. FMSB also loaned money to several family members of the Chambers, including Brian Chambers, Corey Chambers, Walter Chambers, and John Lewis, from time to time. It is clear from the record that the Chambers and their businesses received extremely favorable and personalized treatment from FMSB. Mr. Andrus' father, Garth Andrus, even made a personal loan of money to Mr. Chambers.

4

US Tobacco provided Gravity Enterprises with approximately 95% of its business. In or around 1999, US Tobacco ended its business relationship with Gravity Enterprises and, among other things, refused to pay for services already provided by Gravity Enterprises. Gravity Enterprises filed suit against US Tobacco in July 1999.

In August 1999, R.K. Co. provided what Mr. Chambers described in his testimony to this Court as a "personal loan" to Gravity Enterprises. R.K. Co. is a Texas general partnership owned by Harold Rogers, the attorney who assisted with the creation of the M&J Trust. In exchange for the "personal loan," the M&J Trust granted R.K. Co. a lien on Lots 25 and 26 of Scenic Acres Addition.

Additionally, on August 30, 1999, the Chambers obtained a home equity loan from FMSB in the original principal amount of $264,200. The 1999 loan required the Chambers to make monthly payments of $2,351.21 each (to be modified annually as the prime interest rate changed) on the 29th day of each month beginning on September 29, 1999 and ending on August 29, 2029. A portion of the loan proceeds, $126,161.74, was used to satisfy an outstanding obligation owed by JIMAC to FMSB, and FMSB paid the remaining proceeds to the Chambers in the form of a cashiers check. Mr. Chambers testified that they needed the money to pay for their living expenses during their suit against US Tobacco.

Prior to the loan, the Chambers' residence was situated on a 3.27 acre parcel titled in the name of the M&J Trust. Mr. Chambers obtained a survey of Lots 25 and 26 and carved out a one-acre parcel on which their home was situated to use for collateral. Mr. Chambers testified that he understood that one acre was all he was allowed to pledge for a home equity loan under Texas law at that time. Prior to the closing of the home equity

loan, on August 17, 1999, Mr. Andrus, as the trustee for the M&J Trust, executed a Warranty Deed transferring the one acre upon which the Chambers' home is located from the M&J Trust to the Chambers so that the Chambers could then pledge the one acre as security for the home equity loan.

FMSB obtained an appraisal valuing the Chambers' home at $450,000 as of July 5, 1999 based on a sales comparison approach.[2]  Following the transfer of the one acre to the Chambers, the Chambers designated the one acre as their homestead and paid property taxes on the one acre to the relevant taxing authority.  The Chambers' home address was "15021 Scenic Drive" according to the 1999 loan documents and the subsequent property tax statements relating to their homestead.  The property tax records describe "15021 Scenic Drive" as a portion of Lots 25 and 26 of Scenic Acres Addition.

The Chambers did not keep up with the payments required by their home equity loan agreement.  Their payments were sporadic.  FMSB, however, did not seek to foreclose.  The Chambers and FMSB entered into a modification, renewal and extension of the 1999 loan agreement in November 2000, wherein the Chambers acknowledged an outstanding balance in the amount of $266,428 secured by a lien on their homestead.  The Chambers made their required mortgage payments for the next several months and then, once again, fell behind.

Beginning in 2003, the M&J Trust account was the only account the Chambers maintained at FMSB or any other bank.  Mary Ann and Jimmy Chambers were the only individuals authorized to write checks on the M&J Trust account.  Until November 2004, the Chambers used the M&J Trust account to pay for personal expenses such as groceries

---

[2] The estimated "site value" was $30,000.  The bulk of the appraised value related to the Chambers' home.

6

-- even though the account was already overdrawn.  In or around March 2003, the Chambers drew upon the M&J Trust account to build an elaborate, in-ground pool behind their home (with a pebble finish, slide, diving rock, separate hot tub, and waterfall) and to convert their three-car garage to 1,300 feet of additional living space.  The Chambers also spent $59,000 for the construction of a metal building next to their home.  The front portion of the metal building is a five-car garage, and the rear portion is a shop with windows, doors and plumbing for a bathroom.  Although Mr. Chambers testified that he hired a surveyor to ensure that the metal building would not be constructed on the one acre upon which FMSB had a lien, the Defendant presented evidence suggesting that a corner of the building falls within the one acre pledged to FMSB.

The lawsuit by Gravity Enterprises against US Tobacco settled in March 2003.  US Tobacco wired $2.2 million to FMSB pursuant to the settlement agreement.  Mr. Chambers instructed FMSB to use the settlement proceeds to pay various outstanding debts owed to the bank by the M&J Trust (which owned Gravity Enterprises), the Chambers, the Chambers' businesses, and the Chambers' family members.[3]  After payment of these debts, approximately $150,000 remained.  Mr. Chambers did not request FMSB to use, and FMSB did not use, any portion of the settlement proceeds to make any payment on the 1999 home equity loan.

In the First Amended Complaint, the Chambers contend that they paid over $248,000 during the first 42 months of their home equity loan.  The Chambers presented evidence at trial that they or one of the entities they controlled made four large payments

---

[3] Mr. Chambers initially suggested that these payments were made without his authorization.  Mr. Chambers later contradicted or clarified this portion of his testimony, and the Court found the later portion of Mr. Chamber's testimony to be more credible.

7

to FMSB totaling $193,848.69 during 2002.[4]  The parties, however, dispute whether these payments were intended to be applied to the Chambers' home equity loan or to other obligations owed by the Chambers or their businesses to FMSB.[5]

In December 2003, FMSB apparently rediscovered prudent banking practices, and Mr. Andrus informed Mr. Chambers that he would not allow any more overdrafts on the M&J Trust account.  At that time, the Chambers were unemployed, and the M&J Trust account was overdrawn by approximately $120,000.  The Chambers were attempting to start a small furniture repair business that they could operate out of the building they had constructed next to their home.  They were in arrears on their home loan.  Additionally, the M&J Trust and the Chambers, as guarantors, were in arrears on a loan that the M&J Trust had obtained from FMSB for the purchase of the Chambers' personal vehicles.

In mid-January 2004, Mr. Chambers asked Mary Ann Edelman a question about the balance and interest rate on the 1999 home loan.  Mary Ann Edelman responded a few days later with an electronic message explaining how FMSB had calculated the accrued interest as well as the balance of the loan.  Her message referenced an attached schedule of all payments the Chambers had made on the 1999 home loan and how each payment was applied by FMSB.

---

[4] Prior to 2002, FMSB placed the 1999 loan in "non-accrual" status.  The loan continued to accrue interest, but FMSB no longer considered the interest on the 1999 to be an asset for bookkeeping and financial reporting purposes.  Since FMSB's computer system could not show a credit for non-accrual interest collections, FMSB recorded the Chambers' interest payments manually, in a ledger, during this period.

[5] In particular, the Chambers allege in their First Amended Complaint that they entered into an agreement with FMSB whereby FMSB was permitted to foreclose on two commercial properties owned by the Chambers.  The Chambers further allege that FBSB agreed that the Chambers could market and sell the properties after the foreclosure and that the Chambers would keep any excess proceeds above the loan balances.  The Chambers admit that they agreed to pay for certain expenses relating to the properties.

Mr. Andrus and Mr. Chambers discussed refinancing the 1999 home equity loan and the overdraft on the M&J Trust account on several occasions during 2003 and 2004. On February 3, 2004, Mr. Andrus and FMSB's counsel appeared, uninvited, at the Chambers' home. They informed Mr. Chambers that they were there because of the overdraft on the M&J Trust account. They rejected Mr. Chambers' offer to use some equipment in the metal building next to his home as collateral and suggested that he re-finance his home to take out a bigger loan. They also suggested that, if he agreed to refinance his home, he would need to offer all of Lots 25 and 26 as collateral.[6]

FMSB obtained a new appraisal of the Chambers' home in March 2004. The new appraisal included both Lots 25 and 26 of Scenic Acres Addition. The appraisal and other loan documents describe the address for the property as "9182 Scenic Drive."

The Chambers had made significant improvements to their home since 1999. In addition to spending $59,000 for the new metal building, $70,000 for the in-ground pool, and converting their three-car garage to living space, the Chambers spent approximately $63,000 replacing the brick on their home with stone. With the exception of replacing the brick on their home, which they paid for by selling some real estate, the Chambers used the M&J Trust account to fund their home improvements. The total cost of all of these improvements was more than $200,000.

According to the appraisal report, the market value of the Chambers homestead was $550,000 as of March 4, 2004, based on a sales comparison approach or $572,200

---

[6] After the closing of the 1999 home equity loan, the Texas legislature amended the Texas Constitution to raise the acreage limitation for urban homesteads from one acre to 10 acres. *See* TEX. CONST., art. XVI, § 51 (historical notes).

based on a cost approach.[7]   As a contingent and limiting condition, however, the appraisal report states that the appraiser valued the land in the cost approach at its highest and best value and the improvements at their contributory value.  The report cautions that these valuations are invalid if used separately in conjunction with any other appraisal.

On March 26, 2004, the Chambers entered into an agreement with FMSB for an extension of credit and, in accordance with the agreement, executed a Texas Home Equity Note in the principle amount of $440,000.  The 2004 loan documents required the Chambers to make monthly payments of $3,228.56 each (to be modified annually as the prime interest rate changed) on the 26th day of each month beginning on April 26, 2006 and ending on March 26, 2034.  The collateral for the 2004 home equity loan was Lots 25 and 26 of Scenic Acres Addition, including their home.  R.K. Co. executed a release of its prior lien on Lots 25 and 26 in exchange for a payment from the Chambers.  In addition, Mr. and Mrs. Chambers executed a Warranty Deed as the trustees for M&J Trust pursuant to which they purported to convey all of Lots 25 and 26 from M&J Trust to themselves personally.

Mr. Chambers testified that he saw the loan documents for the first time when he and his wife appeared to sign the loan documents on March 26, 2004.  Among other documents, the Chambers executed a Texas Home Equity Affidavit and Agreement wherein they swore under oath that they were the owners of all of Lots 25 and 26 of Scenic Acres Addition and that their homestead included all of Lots 25 and 26 of Scenic Acres Addition.  The Chambers also executed a Texas Home Equity Deed of Trust

---

[7] In the "cost approach" portion of the appraisal, the appraisal estimated that the "site value" for Lots 25 and 26 was $65,400.  This value includes the one acre previously pledged in connection with the 1999 loan.

whereby they granted FMSB a lien on all of Lots 25 and 26 of Scenic Acres Addition. In addition, the preponderance of the testimonial and documentary evidence admitted at trial established that Mr. Chambers and Mr. Andrus had previously, orally agreed that the Chambers would escrow funds equaling six months of mortgage payments for FMSB to draw upon in the event of a missed mortgage payment.

The Chambers consulted with an attorney several years after entering into the 2004 loan agreement and "discovered" that the M&J Trust had never conveyed title to all of Lots 25 and 26 to them. The Warranty Deed had been executed by the Chambers and not by Vaughn Andrus, the trustee for M&J Trust. Thus, the Debtors contend in this adversary proceeding that M&J Trusts had not effectively conveyed all of Lots 25 and 26 to them at the time of closing and, therefore, they lacked the power or authority to grant FMSB a lien on all of Lots 25 and 26 of Scenic Acres Addition. The Chambers further contend that, as a result of this title defect, the collateral securing the 2004 home equity loan was less than the amount of the 2004 home equity loan.

At the time they entered into the home equity loan agreement, the M&J Trust and the Chambers, as guarantors, were several months in arrears on the car loan the M&J Trust had obtained from FMSB for the Chambers' personal vehicles, and the Chambers owed approximately $36,000 in property taxes. Mr. Chambers testified that he had no recollection of completing an application for the 2004 extension of credit which stated that he was earning a net salary of $100,000, and he testified that FMSB was aware that he was not earning any income. The Chambers testified that they signed all of the loan documents in about fifteen minutes without reading the documents. However, Mr. Chambers did notice that several of the documents contained blanks. He testified that he

asked Mary Ann Edelman about the blanks and that she stated she would fill them in and provide him with copies of the completed loan documents.

One of the documents executed by the Chambers on March 26, 2004, was entitled "Voluntary Payment."   This document states that it was executed by the Chambers to evidence the voluntary nature of several listed payments from the proceeds of the 2004 home equity loan, including a payment of the balance of their existing home equity loan and a payment of approximately $20,000 into an escrow account.   Mr. Chambers testified that this document was blank when he signed the loan documents on March 26, 2004.

FMSB used $223,112.57 of the proceeds of the home equity loan to pay off the existing home equity loan and $36,862.58 to pay the Denton County property tax assessor for all of Lots 25 and 26.   (The M&J Trust had not paid property taxes for several years on the portion of Lots 25 and 26 that remained titled in its name.)   FMSB also placed proceeds representing six months of payments into an escrow account for FMSB to draw upon in the event the Chambers missed a payment.   FMSB deposited the remainder, $155,274.38, into the account for M&J Trust on March 31, 2004.

At that time, the M&J Trust account was the only bank account used by the Chambers, and the M&J Trust account had a negative balance of $139,534.43.   Mr. Chambers had written several "hot" checks on the account prior to March 31, 2004, relating to the payments due under the 1999 home equity loan as well as the loan that the M&J Trust had obtained from FMSB for the Chambers' personal vehicles.   The Chambers assert in this adversary proceeding that this negative balance was inflated by several thousand dollars when FMSB unexpectedly honored the checks Mr. Chambers

12

had written on the M&J Trust's overdrawn account. Mr. Chambers does not, however, deny having written the checks that were honored.

In or around September 2004, Mr. Chambers began questioning how FMSB had applied the payments he had made to FMSB from July 1999 through March 2004. Mr. Chambers' testimony that he made an earlier, oral request to FMSB for this information was not credible or supported by the documentary evidence. The documentary evidence contains copies of numerous electronic messages exchanged between Mr. Chambers and FMSB beginning in September 2004. FMSB promptly responded to Mr. Chambers' inquiries with a loan history for the 1999 home equity loan and spreadsheets, among other things.

In March 2005, the Defendant became the owner of FMSB. The 2004 home equity loan to the Chambers was moved to non-accrual status in March 2005 due to the Chambers' delinquencies. At the time of trial, the Chambers had not made a mortgage payment since May 27, 2005, and had not paid the property taxes relating to their homestead for several years.

On or about August 18, 2005, the Defendant filed a foreclosure action in Texas state court. On December 6, 2005, the Chambers filed a petition in Texas state court seeking, among other things, a declaratory judgment that the Defendant's lien on their home is invalid. The Chambers allege, among other things, that FMSB failed to comply with all of the requirements set forth in the Texas Constitution for obtaining a lien on a homestead.

On February 1, 2006, within 60 days of receiving the Chambers' petition, the Defendant sent a letter to the Chambers addressing their allegations, attaching copies of

the loan documents, and offering to cure the alleged defects in the 2004 loan documents by providing a $1,000 credit to the loan for each violation and offering to refinance the loan on the same terms.  The Defendant instructed the Chambers to contact the author of the letter, Royce Coleman, on or before March 8, 2006, if they desired to refinance their loan.  On the next day, the Defendant sent a letter to the Chambers informing them that the alleged failure of title had been corrected.  In particular, on February 2, 2006, Mr. Andrus, purportedly acting as trustee of the M&J Trust, signed and delivered a Warranty Deed conveying all of Lots 25 and 26 to Jimmy and Mary Ann Chambers.[8]   The Warranty Deed contained the following statement:

> This deed is given to correct a Deed dated March 26, 2004 recorded April 2, 2004, Instrument No. 2004-40880 as such March 26, 2004 conveyance incorrectly had Jimmy Don Chambers, Trustee and Mary Ann Chambers, Trustee as parties to deliver and sign such conveyance when in fact neither Jimmy Don Chambers or Mary Ann Chambers were Trustee/Trustee's as Vaughn Andrus is the Trustee of M& J Trusts created by declaration of trust on March 1, 1996 and would have been the only appropriate party to have executed such Deed on March 26, 2004 and is the present Trustee of M&J Trusts and is necessarily the only appropriate individual to execute the conveyance.  Trustee Vaughn Andrus expressly ratifies the actions of Jimmy Don Chambers and Mary Ann Chambers when they signed, executed and delivered the Deed on March 26, 2004 recorded April 2, 2004, Instrument No. 2004-40880 just as though it was his act and deed at the time of the execution of such instrument and expressly represents that he has been the exclusive continuous Trustee of M&J Trusts since the declaration of trusts on March 1, 1996 and is the sole and exclusive Trustee of M&J Trusts at the time of the signing of the Warranty Deed on February 2, 2006.

On March 8, 2006, Mr. Chambers sent a letter to Mr. Coleman in which he stated that he had tried to call Mr. Coleman that morning "to discuss your letter and various questions we had about your offer."  Mr. Chambers stated that, subject to certain

---

[8] On or about May 22, 2006, the Chambers amended their state court petition to add a claim in which they sought to remove Mr. Andrus as the trustee of the M&J Trust on behalf of the beneficiaries (*i.e.*, their children).

14

conditions, he and his wife would accept the Defendant's offer to refinance their loan. Mr. Chambers further stated that "we cannot simply agree to sign any loan document that you prepare," and he specifically requested that the Defendant prepare documents that, among other things, addressed his claim that the payoff amount for the 1999 loan had been overstated.

Mr. Chambers filed a petition for bankruptcy relief under Chapter 13 of the Bankruptcy Code on September 5, 2007. The only interest in real property listed in his bankruptcy schedules was his interest in "9182 Scenic Drive, Pilot Point, TX."[9]  Mr. Chambers claimed this property as exempt from his creditors under Texas law. He described the nature of his interest in "9182 Scenic Drive, Pilot Point, TX" as "fee simple," and he listed its current market value at $700,000. Mr. Chambers held record title in all of Lots 25 and 26 at the time of his bankruptcy petition, and he did not disclose any interest by M&J Trust in any portion of his homestead property. Mr. Chambers did, however, indicate that he was challenging the Defendant's lien on his homestead.

Mr. Chambers voluntarily converted his case to Chapter 7 on November 1, 2007. The Court subsequently granted a motion by Mark Weisbart, the Chapter 7 trustee, to extend the time for objecting to Mr. Chambers' claimed exemptions to July 1, 2008. Thus, as of the time of trial, Mr. Chambers' interest in his homestead had not yet been withdrawn from the bankruptcy estate.

The Court entered an order discharging Mr. Chambers on February 23, 2008. On April 24, 2008, the Defendant filed proof of its secured claim against Mr. Chambers in the amount of $559,619.70 plus costs and attorneys' fees. The $559,619.70 figure set

---

[9] This address does not match the property tax records introduced into evidence. According to the property tax records, the Chambers' homestead is located at 15021 Scenic Drive.

forth in the Defendant's proof of claim includes $422,927.00 in principle, $131,268.82 in interest, and $5,428.00 in accumulated late charges.

## III. JURISDICTION

The Court tried the homestead lien issue over three days in May 2008. The Defendant continued to urge its abstention arguments at trial, asserting that the homestead lien issue is a non-core matter over which this Court has only "related to" jurisdiction. The Defendant specifically asserted in its closing argument that 28 U.S.C. §1334(b) does not provide this Court with core jurisdiction over the parties' dispute. The Court, having considered the Defendant's arguments, finds that the Defendant's arguments misunderstand the nature of this Court's jurisdiction over the issue of the validity of the Defendant's lien.

As the Defendant pointed out in its closing arguments, the jurisdiction of the federal bankruptcy courts is governed by 28 U.S.C. §§ 157 and 1334. Pursuant to this statutory authority, the bankruptcy courts, upon delegation from the district courts, have jurisdiction of all cases filed under the Bankruptcy Code as well as "all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. §1334(b); 28 U.S.C. § 157(a) (authorization for district courts to refer to the bankruptcy judges any or all bankruptcy cases and any or all related proceedings). The bankruptcy courts also have exclusive jurisdiction over all property of the estate. Specifically, §1334(e) provides:

> The district court in which a case under title 11 is commenced or is pending shall have exclusive jurisdiction of all of the property, wherever located, of the debtor as of the commencement of such case, and of property of the estate.

28 U.S.C. §1334(e). *Cf. Merchants & Farmers Bank of Dumas, Ark. v. Hill,* 122 B.R. 539, 547 (E.D. Ark. 1990) (explaining that one of the purposes of §1334 was to establish both in personam and in rem jurisdiction) (citation omitted).

Section 541(a) of the Bankruptcy Code defines the term "property of the estate" to include "[a]ll legal or equitable interests of the debtor in property as of the commencement of the case," 11 U.S.C. §541(a)(1), and "[a]ll interests of the debtor and the debtor's spouse in community property as of the commencement of the case that is under the sole, equal, or joint management and control of the debtor," 11 U.S.C. §541(a)(2)(A).    Legislative history shows that Congress intended §541(a) to be interpreted broadly.  The House and Senate Reports stated:

> Under paragraph (1) of subsection (a), the estate is comprised of all legal or equitable interest of the debtor in property, wherever located, as of the commencement of the case. The scope of this paragraph is broad. It includes all kinds of property, including tangible or intangible property, [and] causes of action…. The debtor's interest in property also includes "title" to property, which is an interest, just as are a possessory interest, or leasehold interest, for example.

*Wright v. I.R.S. (In re Canon)*, 130 B.R. 748, 750 (Bankr. N.D. Tex. 1991) (citing S. Rep. No. 989, 95th Cong., 2d Sess. 82 (1978); H.R. Rep. No. 595, 95th Cong., 1st Sess. 367 (1977), U.S. Code Cong. & Admin. News 1978, pp. 5787, 5868, 6323).

In this case, the Chambers' homestead is jointly managed community property and, as such, property of Mr. Chambers' estate.  Mr. Chambers listed his interest in "9182 Scenic Drive, Pilot Point, TX" as an asset of his estate in his "Schedule A – Real Property," and he claimed his interest as exempt in his "Schedule C – Property Claimed as Exempt."    Property claimed as exempt may be removed from the estate if the exemption is properly claimed and the time to object to the claim of exemption has

expired.  *See Taylor v. Freeland & Kronz*, 503 U.S. 638, 643 (1992).  Here, the time for objecting to exemptions had not yet run at the time of trial and, therefore, "9182 Scenic Drive, Pilot Point, TX" remained property of the estate.

The administration of property of the estate and the determination of the validity, extent and priority of liens on property of the estate falls within this Court's core jurisdiction.  *See* 11 U.S.C. §157(b)(2)(K).  Many courts, including several courts within the Fifth Circuit, have held that a bankruptcy court's core jurisdiction under 28 U.S.C. §157(b)(2)(K) includes the determination of the validity of liens on property not just of the bankruptcy estate, but also on exempt property of the debtor.  *See, e.g., Jackson v. West (In re Jackson),* 102 B.R. 82 (Bankr. N.D. Tex. 1988) (bankruptcy court has jurisdiction to determine validity of lien on exempt homestead); *Hallmark Capital Group v. Pickett (In re Pickett),* 362 B.R. 794, 796-797 (Bankr. S.D. Tex. 2007) (same).  In some instances, defendants in adversary proceedings involving core matters may be entitled to jury trial, *Granfinanciera v. Nordberg,* 492 U.S. 33 (1989), although not in this particular instance where the Chambers have invoked this Court's equitable power to determine the validity of a lien on property of the estate and the Defendant has filed a proof of claim, *Langenkamp v. Culp,* 498 U.S. 42 (1990).  *See also Katchen v. Landy,* 382 U.S. 323, 336-37 (1966) (no right to a jury trial exists in equitable actions).  Thus, in this case, the Court exercises its core jurisdiction over the dispute regarding the validity

18

of the Defendant's lien on the Chambers' homestead pursuant to 28 U.S.C. §§ 1334(e) and 157(b)(2)(A), (K) and (O).[10]

### III. DISCUSSION

In this adversary proceeding, the Chambers are seeking a mortgage-free house based on FMSB's alleged violations of the Texas Constitution in connection with the home equity loans they obtained from FMSB in 1999 and 2004.  Section 50(a)(6) of the Texas Constitution permits such loans but provides that a borrower's homestead is generally protected from home equity loans except for those loans which satisfy numerous requirements.  Additionally, subsection (a)(6)(f) provides that if the refinance of a debt on a homestead also includes an extension of credit, the lender must comply with the requirements of (a)(6) in order to obtain a valid lien on the borrower's homestead.  The numerous requirements that must be satisfied by a lender in order to create a valid lien securing a home equity loan are designed to protect homeowners from predatory lenders.  *See Rooms With a View, Inc., et al. v. Private Nat'l Mortgage Ass'n*, 7 S.W.3d 840, 847 (Tex. App. – Austin 1999, pet. den.).

Inasmuch as Mr. Chambers has claimed his home as exempt from his creditors under Texas law, the purpose of the Chapter 7 trustee's involvement in this adversary proceeding is not immediately obvious.  A Chapter 7 trustee is generally charged with collecting and reducing to money the "property of the estate."  *See* 11 U.S.C. §704(a)(1).  At trial and in his closing arguments, however, the Chapter 7 trustee explained that Mr.

---

[10] In its order granting in part and denying in part the Defendant's abstention request, the Court invited the Defendant to file a brief on its demand for a jury trial on the issue of the validity of the Defendant's lien.  The Defendant, however, filed a brief attacking the February 12th order rather than addressing the right to a jury trial on the homestead lien issue.  The Defendant requested that the district court permit it to appeal the February 12th order but failed to obtain a stay of this adversary proceeding pending the outcome of the appeal.

Chambers' estate includes not only "9182 Scenic Drive, Pilot Point, TX," but also Mr. Chambers' claims against the Defendant.  The Chapter 7 trustee is seeking to liquidate Mr. Chambers' claims and recover, for the benefit of the Mr. Chambers' bankruptcy estate, a monetary award against the Defendant consisting of all mortgage payments Mr. Chambers made in the past to FMSB.  *See Adams v. Ameriquest Mortgage Co. (In re Adams),* 307 B.R. 549, 553 (Bankr. N.D. Tex. 2004) (citing *Thomison v. Long Beach Mortgage Co.,* 176 F.2d 714, 718 (W.D. Tex. 2001), *vacated by* 2002 WL 32138252 (W.D. Tex. 2002)).

The claims asserted in the Plaintiffs' First Amended Complaint are essentially the same as those asserted in the Chambers' state court petition, as amended.  Although the First Amended Complaint and the state court petition occasionally refer to home equity "loans" as well as "a" home equity "loan," the First Amended Complaint and the state court petition do not specifically reference the 1999 home equity loan or any facts surrounding the 1999 home equity loan.  For example, the first paragraph of the statement of facts in the First Amended Complaint states that "[FMSB] compelled and required the Chambers to use proceeds from a home equity loan … to pay other unsecured debt owed to [FMSB]" and "at the time the bank made such loans, [FMSB] knew that the Chambers' [sic] could not afford making the payments on such loans [sic]."

The Plaintiffs did not specifically raise a constitutional issue with respect to the 1999 home equity loan until on or about March 25, 2008.  The Plaintiffs' attorney sent a letter to the Defendant on or about that date, detailing 19 "problems and/or constitutional deficiencies and/or violations" with respect to the 1999 home equity loan.  Most of these 19 issues related to alleged contractual violations.  The issues raised in the March 25th

letter that seem to touch upon the requirements for home equity lending under the Texas Constitution are (1) "advances under loan tantamount to home equity line of credit which, at the time, was not allowed by constitution," (2) "violation of substantially equal payment requirements," and (3) "to the extent payments applied to other loans – violation of prohibition against cross collateralization."   The Plaintiffs' attorney complained that the Defendant had failed to cure the alleged violations of the Texas Constitution, failed to effect cure within a reasonable time, and, to the extent a cure offer was made by the Defendant, the cure offer was "improper."

With respect to the 2004 home equity loan, the First Amended Complaint and the March 25th letter to the Defendant allege that the loan violated numerous subsections of article XVI, §50(a)(6) of the Texas Constitution.  The Plaintiffs allege that FMSB did not give the required disclosures in a timely manner (TEX. CONST., art. XVI, §40(a)(6)(Q)(v)); the security instruments failed to disclose that the extension of credit was the type defined by article XVI, §50(a)(6), of the Texas Constitution (TEX. CONST., art. XVI, §40(a)(6)(Q)(vi)); the Chambers were not given three days after the extension of credit was made to rescind the extension of credit without penalty or charge (TEX. CONST., art. XVI, §40(a)(6)(Q)(viii)); the refinance of debt secured by the homestead included the advance of funds that could not be secured by a valid lien on the homestead (TEX. CONST. art. XVI, §50(e)); the loan was not voluntary (TEX. CONST. art. XVI, §50(a)(6)(A)); because of a partial failure of title, the extension of credit did not comply with the 80% loan to value ratio required in article XVI, §50(a)(6)(B), of the Texas Constitution; the loan is an open ended account, not a home equity line of credit (TEX. CONST. art. XVI, §50(a)(6)(F)); the loan is secured by real or personal property other than

21

the homestead (TEX. CONST. art. XVI, §50(a)(6)(H)); the loan was not the only debt secured by the homestead at the time the extension of credit was made, and the other debt was not made for a purpose described in article XVI, §50(a)(1)-(5) or (a)(8) of the Texas Constitution (TEX. CONST. art. XVI, §50(a)(6)(K)); the loan was not scheduled to be repaid in substantially equal periodic installments (TEX. CONST. art. XVI, §50(a)(6)(L)); the loan was closed before the 12th day after the Chambers submitted an application to FMSB for the extension of credit, and the loan closed before one business day after the date that the Chambers received a final, itemized disclosure of the actual fees, points, interest, costs and charges that would be charged at the closing (TEX. CONST. art. XVI, §50(a)(6)(M)); and the loan did not permit a lender to contract for and receive any fixed or variable rate of interest authorized under the statute (TEX. CONST. art. XVI, §50(a)(6)(O)).

The Defendant contends that neither the 1999 loan nor the 2004 loan violated any provision of the Texas Constitution. The Defendant contends that the Chambers are estopped from contradicting their assertions in the loan documents, that the Chambers have waived their right to complain about the loan documents, and that the Chambers have ratified the actions of the Defendant with respect to the 1999 and 2004 home equity loans. With respect to the 1999 loan, the Defendant contends that the Plaintiffs' claims are time-barred by the applicable four year statute of limitations under Texas law. With respect to the 2004 loan, the Defendant contends that it has cured any violations of article XVI, §50 of the Texas Constitution. The Defendant further contends that it is entitled to its attorneys' fees and expenses incurred in enforcing the validity of the 2004 loan pursuant to paragraph 7(E) of the 2004 Texas Home Equity Note between the Chambers

and FMSB.  Alternatively, in the event the Court declares the 2004 lien invalid, the Defendant contends that it is entitled to equitable subrogation.

The Court will address each of these issues in the following analysis.  With respect to the 2004 home equity loan, the Court will discuss (1) whether the loan was voluntary; (2) the value of the Chambers' homestead; (3) whether the 2004 home equity loan was secured by property other than the homestead; and (4) the myriad other defects alleged by the Plaintiffs with respect to the 2004 home equity loan.  Next, with respect to the 1999 loan, the Court will discuss whether the Plaintiffs timely alleged a violation of the Texas Constitution and whether the Plaintiffs established such a violation at trial.

### A. The 2004 Home Equity Loan

The evidence submitted in this case reflects that the 2004 loan involved the refinance of an existing loan on the Chambers' homestead and included an additional extension of credit.  Thus, FMSB was required to meet the requirements of article XVI, §50(a)(6) of the Texas Constitution in order to obtain a valid lien against the Chambers' home.  With respect to any failure to comply with these requirements, the applicable statutory cure provision states in pertinent part that:

> [T]he lender or any holder of the note for the extension of credit shall forfeit all principal and interest of the extension of credit if the lender or holder fails to comply with the lender or holder's obligations under the extension of credit and fails to correct the failure to comply not later than the 60th day after the date the lender or holder is notified by the borrower of the lender's failure to comply by:....(f) if the failure to comply cannot be cured under Subparagraphs(x)(a)-(e) of this paragraph, curing the failure to comply by a refund or credit to the owner of $1,000 and offering the owner the right to refinance the extension of credit with the lender or holder for the remaining term of the loan at no cost to the owner on the same terms, including interest, as the original extension of credit with any modifications necessary to comply with this section or on terms on which the owner and the lender or holder otherwise agree that comply with this section...." "

23

TEX. CONST. art. XVI, § 50(a)(6)(Q)(x).[11]   A borrower provides adequate notice of the
lender's failure to comply with the requirements of §50(a)(6) by taking reasonable steps
to notify the lender or holder of the alleged failure to comply.  The notice must include a
reasonable identification of the borrower and the loan as well as a description of the
failure to comply.  *See* 7 TEX. ADMIN. CODE §153.91 (effective November 11, 2004);
*Curry v. Bank of America, N.A.,* 232 S.W.3d 345, 354 (Tex. App. – Dallas 2007, no pet.)
(looking to §153.91 as instructive and holding a letter that lacked factual details was
inadequate notice of an alleged violation of §50(a)(6)).

       As a general matter, the home equity lender has the burden to prove that a lien
exists for some reason other than estoppel.  *See Hruska et ux. v. First State Bank of
Deanville et al*., 747 S.W.2d 783, 785 (Tex. 2001).  Only after that burden is discharged
can there be a basis to support a claim of waiver or estoppel.  *Id.*  In other words, while a
homestead claimant may, under certain circumstances, be estopped to deny the validity of
an existing lien, "[a] lien cannot be 'estopped' into existence."  *Id.* (citing *Lincoln v.
Bennett,* 156 S.W.2d 504, 505 (Tex.1941)).  Moreover, any failure by the lender to
comply with the requirements for creating a constitutionally permissible lien against a
homestead may not be waived or ratified by the homestead claimant.  *Kepley v. Zachry,*
116 S.W.2d 699, 701 (Tex. Com. App. 1938).

       The Court, therefore, turns to the Plaintiffs' complaint that the 2004 home equity
loan from FMSB violated the Texas Constitution.  The 2004 home equity loan was a

       [11] In 2003, the Texas Legislature proposed several amendments to article XVI, §50(a)(6), of the Texas
Constitution.  The legislative history states that the amendments were "clarifying the cure process" by
"authorizing home equity lines of credit" and "establish[ing] provisions for a lender to cure an error in
home equity lending."  *See* House Committee Report, Tex. S.J.R. 42, 78th Leg., R.S. (2003); Senate
Committee Report, Tex. S.J.R. 42, 78th Leg., R.S. (2003).  Among other changes to the cure process, the
Texas legislature deleted a requirement that the lender must correct any defect within a reasonable period
of time and replaced the requirement with the more specific series of cure provisions set forth above.

constitutionally permissible loan.   The Chambers complain that the loan is invalid because the loan did not meet all of the constitutional requirements, namely, the loan was not voluntary and the loan amount exceeded 80% of the value of their "homestead," which they argue consists of only one acre of Lots 25 and 26 of Scenic Acres Addition due to a "title defect."  The Court will address each of these complaints in turn.   The Court will then address the Plaintiffs' remaining complaints, which the Plaintiffs addressed only briefly, if at all, in their written closing arguments.   The Plaintiffs have the burden to establish that certain constitutional requirements were not met.  *See Wilson v. Aames Capital Corp*. 2007 WL 3072054 (Tex. App. – Houston [14 Dist.] 2007, no pet.) (rejecting an argument that the burden of proof was on the home equity lender on judicial economy grounds).  *See generally Greathouse v. Charter Nat'l Bank-Sw.,* 851 S.W .2d 173, 175-176 (Tex. 1992) (describing considerations affecting the allocation of burdens of proof).  *See also* Frank A. St. Claire, *Tex. Real Estate Guide* §§ 53.130[1][b] & 53.131 (stating that invalidity of lien based on noncompliance with the constitutional requirements is an affirmative defense).

### *1. Voluntariness Under §50(a)(6)(A) and (Q)(i)*

Article XVI, §50(a)(6)(A) of the Texas Constitution requires that a lien on a homestead must be voluntary.   This section states, "[t]he homestead ..." is hereby protected from forced sale, for the payment of all debts except for ... an extension of credit that is secured by a *voluntary lien* on the homestead...."   (Emphasis added.). Additionally, §50(a)(6)(Q)(i) states:

> The homestead ... shall be, and is hereby protected from the forced sale,
> for the payment of all debts except for ... an extension of credit that ... is
> made on condition that ... the owner of the homestead is not required to

apply the proceeds of the extension of credit to repay another debt except debt secured by the homestead or debt to another lender.

TEX. CONST. art. XVI, § 50(a)(6)(Q)(i) (amended 2003).

In connection with certain amendments to the home equity lending provisions in the Texas Constitution in 2003, the Texas legislature revised Chapter 11 of the Texas Finance Code to allow the Texas Finance Commission to promulgate interpretative regulations of the home equity loan provisions.  *See* TEX. FIN. CODE ANN. §11.308.  With respect to §50(a)(6)(A), the Texas Finance Commission has interpreted this provision to require that the lender obtain the consent of each owner and each owner's spouse.  7 TEX. ADMIN. CODE §152.2 (effective January 8, 2004).  An owner or an owner's spouse may consent to the lien by signing a written consent, which may be included in the mortgage instrument.  7 TEX. ADMIN. CODE §152.2(2) (effective January 8, 2004).  With respect to §50(a)(6)(Q)(i), the Texas Finance Commission has interpreted this provision to mean that "[a]n owner may apply for a home equity loan for any purpose."  7 TEX. ADMIN. CODE §153.18(2) (effective June 29, 2006).  Thus, "[a]n owner is not precluded from voluntarily using the proceeds of an equity loan to pay on a debt owed to the lender making the loan."  *Id.*  Voluntariness must be determined based on the facts of each case. *See, e.g., Box v. Fist State Bank (In re Box)*, 340 B.R. 782, 787 (S.D. Tex. 2006).

Here, the Chambers signed various documents representing that the 2004 home equity loan was voluntary at the time they entered into the loan agreement.  The Chambers argue in this adversary proceeding that the loan was, in fact, involuntary because FMSB threatened foreclosure on their home as a consequence of their deficiencies under the 1999 loan, legal action to collect the overdraft on the M&J Trust account, and repossession of their personal vehicles.  The Chambers also argue that the

loan was involuntary because FMSB required them to apply some of the loan proceeds to the overdraft in the M&J Trust account.  The Court cannot discern whether the Chambers are attempting to argue that the home equity loan was the product of undue influence, unconscionability, or coercion.   Regardless of label, however, the reality is that the Chambers fell on financial hard times and were unable to pay the mortgage on their home, make their car payments, or cure the overdraft in the M&J Trust account.  Consequently, FMSB alerted them that it was considering exercising its legal rights, including foreclosure on their home and legal action to collect the overdraft.  Unable to cure their defaults, the Chambers willingly agreed to enter into the 2004 home equity loan agreement.

Under Texas law, a contract may be invalid or unenforceable by reason of economic duress where undue or unjust advantage has been taken of a person's economic necessity or distress to coerce him or her into making the agreement.  *See First Texas Sav. Ass'n of Dallas v. Dicker Center,* 631 S.W.2d 179, 186 (Tex. App. -- Tyler 1982, no pet.) (quoting 17 C.J.S. *Contracts,* §177 (1963)).  Economic duress must be based on the acts or conduct of the opposite party and not merely on the financial circumstances of the purported victim.  *Id.*  Likewise, one party's exercise of its contractual rights is not the type of "control" that justifies the application of the equitable subrogation doctrine.  *See Matter of U.S. Abatement Corp.,* 39 F.3d 556, 562 (5th Cir. 1994).

The Court finds, as a matter of fact, that the Chambers voluntarily agreed to a lien on their home in connection with the 2004 loan agreement.  At the time of the 2004 loan, FMSB already held a constitutionally valid lien on their homestead (as discussed more fully below).  Although the Chambers were facing losing their home because they had

27

failed to make all of the required payments to FMSB, the possibility of a foreclosure by FMSB did not preclude the Chambers from voluntarily entering into a refinancing agreement. If the Court were to follow the Chambers' reasoning, no Texas homeowner would be able to refinance his current home loan if that loan was in default.

The record in this case reflects that the Chambers enjoyed a level of accommodation from Mr. Andrus and FMSB that most ordinary people do not receive from their banks. The record further reveals that the Chambers' business was defunct at the time of the 2004 loan, and, while the Chambers may have been faced with an undesirable situation, it was not the result of any coercion, fraud, or undue influence by FMSB. In fact, FMSB did not post their home for foreclosure, and the Chambers did not enter into the 2004 loan agreement until more than three weeks after Mr. Andrus visited them at their home.

With respect to the Plaintiffs' claim that FMSB violated §50(a)(6)(Q)(i) of the Texas Constitution, this claim is based on the alleged oral representations of Mr. Andrus and FMSB's counsel regarding payment of the overdraft in the M&J Trust account. The Plaintiffs' claim for a violation of §50(a)(6)(Q)(i) is, therefore, barred by the statute of frauds. *See* TEX. BUS. COM. CODE § 26.01(a), (b)(4). *See also Foster v. Bank One Texas NA,* 54 Fed. Appx. 592 (5th Cir. 2002).[12] Moreover, the fact that the home equity loan satisfied the overdraft in the M&J Trust account flowed naturally from the fact that the Chambers used that account as their personal piggy bank as well as the fact that the

---

[12] The Fifth Circuit's opinion in *Foster* involved similar claims and is persuasive authority. *See* 5th Cir. R. 47.5.4. In that case, Foster argued, among other things, that a home loan he had received was void or voidable under Article XVI, § 50(a)(6)(Q)(i) of the Texas Constitution because the loan officer allegedly informed him that he was required to use the proceeds of the loan to pay off advances made on his money market account. Since the promissory note and lien did not require such payments, the Fifth Circuit determined that Foster's claim was barred by the statute of frauds.

account was materially overdrawn when the funds were deposited.  The Chambers could have, but did not, open a personal bank account and demand that the proceeds of the home equity loan be placed in the new account.  Accordingly, and for all of the foregoing reasons, the Court concludes that the 2004 loan agreement was voluntary and satisfies the requirements listed in §50(a)(6) and (Q)(i).

### 2. The Value of the Chambers' Homestead

Article XVI, §50(a)(6)(B) of the Texas Constitution requires that the principle amount of a home equity loan may not exceed "80 percent of the fair market value of the homestead on the date the extension of credit was made…."  Section 50(h) of the Texas Constitution provides that a lender may conclusively rely on the written acknowledgment as to the fair market value of the homestead property if the value acknowledged is the value estimated in an appraisal or evaluation prepared in accordance with a state or federal requirement applicable to an extension of credit under subsection (a)(6).  Here, the Chambers and Mr. Andrus signed an Acknowledgment of Fair Market Value of Homestead Property on March 26, 2004, and the Defendant produced the appraisal upon which the Fair Market Value Statement was made.  These documents state that the Fair Market Value of the Chambers' homestead was $550,000 as of March 26, 2004.

The Fair Market Value Statement and the Acknowledgment of Fair Market Value of Homestead Property were based on the assumption that the Chambers were the owners of all of Lots 25 and 26 of the Scenic Acres Addition.  The principle amount of the 2004 home equity loan was $440,000, or 80% of the stipulated fair market value of all of Lots 25 and 26.  In this proceeding, however, the Plaintiffs argue that this valuation was too high.  The Chambers assert that the 2004 Warranty Deed transferring Lots 25 and 26 to

29

them was defective inasmuch as it was signed by them instead of Mr. Andrus as the trustee for the M&J Trust.

As an initial mater, as discussed more fully below, FMSB had a valid lien on the Chambers' home and the one acre surrounding the home at the time the parties entered into the 2004 loan agreement.  This one acre and the home were also included in the security granted by the 2004 loan agreement.  The Chambers do not dispute the fact that this one acre belonged to them, that this one acre is and has been their homestead for many years, or that they had the power to convey an interest in the one acre to FMSB in March 2004.  Therefore, at a minimum, the Defendant has a valid lien on the one acre parcel and the home.

Moreover, Mr. Chambers claimed all of Lots 25 and 26 as property in which he had an exempt, fee simple interest in his bankruptcy schedules.  Statements in the bankruptcy schedules are executed under penalty of perjury and, when offered against a debtor, are eligible for treatment as judicial admissions.  *See Larson v. Groos Bank, N.A.,* 204 B.R. 500, 502 (W.D. Tex. 1996).  Although such statements may be changed or withdrawn during the pendency of the bankruptcy case, Mr. Chambers did not change his schedule of exempt property.  *See* FED. R. BANKR. P. 1009(a) ("A voluntary petition, list, schedule, or statement may be amended by the debtor as a matter of course at any time before the case is closed.").  Mr. Chambers may not now claim that his fee simple interest in his homestead does not include all of Lots 25 and 26 or that the Warranty Deeds are not effective.  Further, the Court finds as a matter of fact that the Chambers desired and intended to transfer an interest in all of Lots 25 and 26 to themselves when they signed the Warranty Deed as trustees for the M&J Trust.

The Chambers knew that they were not the trustees for the M&J Trust when they signed the Warranty Deed in connection with the 2004 loan agreement. Vaughn Andrus, the trustee for the M&J Trust, was aware of all material facts relating to the pledge of all of Lots 25 and 26 as security for the loan. It appears to the Court, and the Court so finds, that counsel for FMSB and the Chambers mutually made a mistake when preparing and executing the Warranty Deed by describing the Chambers as trustees for the M&J Trust. When the Chambers finally raised an issue with their signatures on the Warranty Deed, Vaughn Andrus, the trustee for the M&J Trust, executed a new Warranty Deed that expressly ratified the original Warranty Deed signed by the Chambers.[13]

A defectively executed deed may be ratified and confirmed under Texas law. *See* 30 TEX. JUR. 3d *Deeds* § 18 (collecting cases). Even a void deed may be ratified by confirmation by a person with knowledge of all material facts. *See National Bank of Commerce v. May,* 583 S.W.2d 685, 690 (Tex. Civ. App. – Eastland 1979, writ ref'd n.r.e.). *See also Disney Enters., Inc. v. Esprit Fin., Inc.*, 981 S.W.2d 25, 31 (Tex. App. -- San Antonio1998, pet. dism'd w.o.j.) ("Ratification is the affirmance by a person of a prior act which when performed did not bind him, but which was professedly done on his account, whereby the act is given effect as if originally authorized by him."). As between the parties to the instrument, a ratification takes effect from the time the proper acknowledgement was first made and relates back to the effective date of the original

---

[13] In their closing arguments, the Defendant described the deed executed by Mr. Andrus as a "correction deed" that relates back to the original deed. Indeed, a correction deed may be filed for the purpose of correcting some facial imperfection in the title. *See Adams v. First Nat'l Bank of Bells/Savoy,* 154 S.W.3d 859, 871 (Tex. App. – Dallas 2005, no pet.) (citing *Joe T. Garcia's Enterprises, Inc. v. Snadon,* 751 S.W.2d 914, 916 (Tex. App. -- Dallas 1988, writ den.). However, the fact that a deed is called a "correction deed" does not alter the principle that the meaning of the instrument must be determined from review of the deed's four corners and application of the rules of construction. *See Centerpoint Energy Houston Elec., L.L.P. v. Old TJC Co.,* 177 S.W.3d 425, 433 (Tex. App. – Houston [1st Dist.] 2005, pet. den.).

instrument. *See Hill v. Foster*, 186 S.W.2d 343, 347 (Tex. 1945). As to bona fide purchasers for value and without notice, in contrast, the ratification does not relate back to the original instrument, but takes effect on the date of ratification. *Id.*

In this case, the Court concludes that the Warranty Deed has been ratified by the M&J Trust and, under Texas law, was effective as between the parties at the time of the 2004 loan agreement. The Chambers owned all of Lots 25 and 26 at the time of the 2004 loan as a result of the ratification of the original Warranty Deed by the trustee for the M&J Trust.[14] The Court, therefore, concludes that the 2004 loan agreement did not violate §50(a)(6)(B).

Even if the Court were to reach a contrary conclusion, namely, that the Warranty Deed was not effective at the time of the 2004 loan agreement, the evidence in this case does not establish that the 2004 loan violated §50(a)(6)(B). Mr. Chambers valued his "fee simple" interest in the entire 3.27 acre parcel at $700,000 in his bankruptcy schedules. There was no evidence at trial of any material change to the Chambers' homestead between March 2004 and the petition date in the underlying bankruptcy case. *See Estate of Kaplin v. Commissioner,* 748 F.2d 1109, 1111 (6th Cir. 1984) (a two-year difference in sale and valuation date was of no consequence where there is no intervening evidence of any event changing the value of the property between the two dates). The 2004 appraisal valued Lots 25 and 26 at $67,000, noting that the fringe of land surrounding the Chambers' home has little value aside from its use by the Chambers as part of their homestead. Thus, even if the Court were to exclude the portions of Lots 25

---

[14] Notably, this case does not involve consent by a homeowner to a constitutional defect in a home equity loan. The ratification in this case was by M&J Trust, not the Chambers. Moreover, the ratification did not relate to the terms of the home equity loan, but to the transfer of property to the Chambers.

and 26 not included in the homestead in connection with the 1999 loan, the value of the one-acre parcel including the Chambers' home was at least $633,000 in March 2004.[15]  In light of all of the evidence, including the judicial admissions contained in Mr. Chambers' schedules, *see Larson,* 204 B.R. at 502, the Court finds and concludes, based on the preponderance of the evidence, that the 80% loan to value ratio was met.[16]

### 3. The Chambers' Interest in Lots 25 and 26

Article XVI, §50(a)(6)(H) of the Texas Constitution prohibits a home equity loan from being secured by "any additional real or personal property other than the homestead."   The Texas Constitution restricts the maximum size of a protected homestead, limiting rural and urban homesteads by acres of land together with any improvements on the land.   *See* TEX. CONST. art. XVI, § 51.   It also describes a homestead as "a home, or as both ... [a] home and a place to exercise a calling or business."  *Id.*  The Texas Property Code similarly describes a homestead as a home or a home and a business, with certain acreage limitations, including the "improvements thereon."  TEX. PROP. CODE. § 41.002.

The Texas Constitution and the Texas Property Code broadly define the term "homestead" in order to protect homeowners from forced sales to pay general debts.  In cases where the homestead exemption has been used as a shield to protect a homeowner, Texas courts have interpreted these provisions to allow a homestead interest to attach to

---

[15] This valuation is arguably low inasmuch as the $67,000 valuation for Lots 25 and 26 includes the one-acre parcel designated by the Chambers as their homestead in 1999.

[16] The record contains other evidence that supports this conclusion.  The Chambers' home and the surrounding one acre were valued at $450,000 in connection with the 1999.  The Chambers subsequently added 1,300 square feet of living space and an elaborate pool, and they re-faced their home with stone. Even excluding the cost of the new metal building, which arguably does not sit completely on the original one-acre parcel, the Chambers improved the value of their homestead by more than $100,000 after the 1999 loan and prior to the 2004 loan.

an interest that is less than an unqualified fee simple title.  Under Texas law, a homestead may attach to any possessory interest, subject to the inherent characteristics and limitations of the right, title or interest in the property.  *See Inwood North Homeowners' Ass'n, Inc. v. Harris*, 736 S.W.2d 632, 636 (Tex. 1987).[17]

In this case, Jimmy and Mary Ann Chambers controlled the M&J Trust and all of Lots 25 and 26 at all material times.[18]  The Chambers used the M&J Trust as their personal piggy bank.  The preponderance of the evidence at trial demonstrated that Mr. Andrus simply followed the instructions given to him by the Chambers with respect to Lots 25 and 26 and all other assets of the M&J Trust.  The Chambers' use of all of Lots 25 and 26 was continuous and open since at least 1999.  After entering into the 1999 loan agreement, for example, the Chambers deliberately constructed a shed for their personal use on property they believed to be outside of the one acre which they believed remained titled in the name of the M&J Trust.  The Chambers used hundreds of thousands of dollars from the M&J Trust to improve their homestead, and, in connection with the 2004 loan agreement, they signed documents transferring all of Lots 25 and 26 to themselves as if they had a right to do so.

When he filed his bankruptcy schedules, Mr. Chambers was aware that the trustee for the M&J Trust had ratified the 2004 Warranty Deed.  Mr. Chambers described his homestead in his bankruptcy schedules by using the same address as in the 2004 loan agreement wherein he pledged a lien on all of Lots 25 and 26.  Mr. Chambers claimed his

---

[17] For example, ownership of the fee is not essential to the existence of a homestead under Texas law. Mere possession, such as through a lease, is enough to sustain a claim of homestead and prevent a forced sale against all of the world except the true owner and those claiming under him.  *See* 43 TEX. JUR. *Homestead* § 51 (discussing the estate or interest required for a homestead).

[18] The Defendant has not alleged or sought to establish that M&J Trust was the alter ego of the Chambers in this adversary proceeding.

34

"fee simple" interest in the entire 3.27 acre parcel as exempt from his creditors.   He thereby accepted the benefit of the pre-bankruptcy ratification of the Warranty Deed by the trustee for the M&J Trust, and this acceptance raises the question of estoppel.   In other words, having claimed an exemption of a fee simple interest in all of Lots 25 and 26 based on the ratification of the Warranty Deed, is Mr. Chambers judicially estopped from arguing that he "rejected" the Warranty Deed executed by Mr. Andrus?

"Judicial estoppel is a common law doctrine that prevents a party from assuming inconsistent positions in litigation."   *Superior Crewboats Inc. v. Primary P & I Underwriters (In re Superior Crewboats, Inc.),* 374 F.3d 330, 334 (5th Cir. 2004).   The purpose of judicial estoppel is to protect the integrity of the judicial process, rather than the litigants.   *See Browning Mfg. v. Mims (In re Coastal Plains, Inc.),* 179 F.3d 197, 205 (5th Cir. 1999).   In order for judicial estoppel to apply, the Court must find that (1) the party's position is "clearly inconsistent with the previous one;" (2) "the court must have accepted the previous position;" and (3) "the non-disclosure must not have been inadvertent."   *Superior Crewboats,* 374 F.3d at 335.

As the Fifth Circuit explained in *Superior Crewboats*, the "Bankruptcy Code and Rules impose upon bankruptcy debtors an express, affirmative duty to disclose all assets, *including contingent and unliquidated claims.*"   *Superior Crewboats,* 374 F.3d at 335 (emphasis in original) (quoting *Coastal Plains,* 179 F.3d at 207-08).   Here, the omission of M&J Trust's alleged ownership interest in Mr. Chambers' homestead "is tantamount to a representation that no such claim existed."   *Id.*   Mr. Chambers' claimed exemption of his "fee simple" interest the property located at 9182 Scenic Drive is clearly inconsistent with his position in this adversary proceeding that the M&J Trust owns all but one acre of

the property located at 9182 Scenic Drive.  Mr. Chambers testified at trial that he never received a copy of the Warranty Deed signed by Mr. Andrus, and he stated in his closing arguments that, under Texas law, the M&J Trust still owns the 2.27 acres.  As the Fifth Circuit noted, "[s]uch blatant inconsistency readily satisfies the first prong of the judicial estoppel inquiry."  Mr. Chambers did not amend his bankruptcy schedules to conform to his arguments in this adversary proceeding.  Moreover, the Court adopted Mr. Chambers' position that M&J Trust has no claim on the property he is using as his homestead by issuing a discharge in the main bankruptcy case.  *See Superior Crewboats,* 374 F.3d at 335.

Even under the narrow definition of homestead urged by the Plaintiffs, that is, that only the portion of Lots 25 and 26 titled in the Chambers' name at the time of the 2004 loan constitutes their homestead, the Plaintiffs' arguments do not prevail.  Paragraph 4 of the Texas Home Equity Deed of Trust states in pertinent part:

> This Extension of Credit is secured solely by the Homestead Property. Neither Lender nor any other party has required any collateral other than the Homestead Property to secure this Extension of Credit.
>
> Any provision contained in this Security Instrument and any other document between the parties or with any third party … which gives Lender a security interest in any personal or real property other than the Homestead Property, shall not apply to this Extension of Credit.

Thus, to the extent that FMSB's 2004 lien encumbered non-homestead property in violation of §50(a)(6)(H), any defect was automatically cured.  *See Foster v. Bank One Texas NA,* 54 Fed. Appx. 592 (5th Cir. 2002).[19]  The terms of the loan documents reduce

---

[19] As previously noted, the Fifth Circuit's opinion in *Foster* involved similar claims and is persuasive authority. Foster argued that the lien on his residence was invalid under § 50(a)(6)(H) of the Texas Constitution because it encumbered real property in excess of the permissible amount and granted Bank One a security interest in personal property.  At the time the promissory note and lien for the loan were executed, a homestead in a city, town or village was limited to one acre of land. Foster's home was situated

FMSB's lien to the one acre owned by the Chambers so that home equity loan falls within the boundaries set by the Texas Constitution.

### 4. Other Alleged Constitutional Defects

The Plaintiffs allege numerous additional violations of the Texas Constitution with respect to the 2004 home equity loan.  The Plaintiffs allege that FMSB violated §50(a)(6)(H) by orally requiring the Chambers to deposit a portion of the loan proceeds into an escrow account.  This claim is not based on a written agreement and, as previously discussed, is barred by the statute of frauds.[20]  The Plaintiffs also allege, among other things, that FMSB failed to provide the Chambers with complete copies of the loan documents, did not give the required disclosures in a timely matter, did not give the Chambers a three-day rescission period, and that the loan was closed less than twelve days after the Chambers submitted an application to FMSB for an extension of credit.

Article XVI, §50(a)(6)(Q)(x)(a) – (e) of the Texas Constitution lists several specific ways a lender can cure a failure to comply with the requirements of article XVI, §50(a)(6) of the Texas Constitution.  Section 50(a)(6)(Q)(x)(d), for example, provides that a lender may cure a failure to deliver documents to the borrower by delivering the required documents.  Subsection (x)(f) is a "catch all" provision that applies to those

---

on 1.75 acres.  Although this encumbrance would constitute a violation of §50(a)(6)(H), the loan documents provided that "notwithstanding any provision of this Homestead Lien Contract[ ] to the contrary in no event shall this Homestead Lien Contract require or permit any action which would be prohibited by Section 50(a)(6), Art. XVI, Texas Constitution, and all provisions of this Homestead Lien Contract shall be modified to comply fully with Section 50(a)(6), Art. XVI, Texas Constitution."  Thus, the Fifth Circuit held that, to the extent the lien encumbered property in violation of § 50(a)(6)(H), any defect was automatically cured by the terms of the loan documents.

[20] In addition, in their closing arguments, the Plaintiffs alleged that the escrowed funds "could be considered" a closing cost or prepayment.  The Plaintiffs, however, failed to present the Court with authority supporting such an analysis.  To the contrary, the escrowed funds were not a closing cost as that term is understood in Texas real estate law.  *See, e.g.,* 7 TEX. ADMIN. CODE § 89.601 (listing examples of closing costs for a property tax loan secured by a homestead).

violations not addressed in subsection (x)(a) – (e).  Section 50(a)(6)(Q)(x)(f) states that "if the failure to comply cannot be cured under Subparagraphs (x)(a) – (e)," then the lender may refund or credit to the owner $1,000 and offer to refinance at no cost to the owner for the remaining term under the same terms.

The Plaintiffs in this proceeding assert that §50(a)(6)(Q)(x)(f) is not the appropriate cure for the violations of which the Chambers complain.  Since none of the other cure provisions apply to most of the Plaintiffs' alleged violations, the Plaintiffs are essentially arguing that most of the alleged defects are incurable.  The Plaintiffs cited no authority for this position in their closing arguments nor has the Court discovered any supporting authority.  To the contrary, the Texas Supreme Court has held that the cure provision in §50(a)(6)(Q)(x) applies to all the lender's obligations under §50(a)(6) as well as §50(c)'s requirements that to be valid a homestead lien must secure a debt described by §50(a)(6).  *See Doody v. Ameriquest Mort. Co.,* 49 S.W.3d 342 (Tex. 2001).  The Texas Supreme Court's language in *Doody* regarding the cure provision was unambiguous and unqualified – "section 50(a)(6)(Q)(x) is a cure provision that applies to all of section 50(a)…. and also operates as a cure provision that validates a lien securing a section 50(a)(6) extension of credit" *Doody,* 49 S.W.3d at 345-346.  The amendments made to §50(a)(6)(Q)(x) in 2003, after the Texas Supreme Court issued *Doody,* further clarify that all of the §50(a)(6) requirements are subject to the cure provision.  *See Adams v. Ameriquest Mortgage Co. (In re Adams)*, 307 B.R. 549, 555-56 (Bankr. N.D. Tex. 2004) (discussing *Doody* and the amendments to §50(a)(6)(Q)(x)).

Here, the Defendant made an offer to cure the alleged constitutional defects in the 2004 home equity loan by crediting $1,000 to the loan for each alleged defect and by

refinancing the balance of the loan at no cost to the Chambers in compliance with §50(a)(6)(Q)(x).  The Chambers did not accept the Defendant's offer.  Instead, they insisted that the terms of the refinanced loan should be different than the 2004 loan and, in particular, that the remaining balance should be significantly lowered based on payments that the Chambers claim should have been credited to the 1999 loan rather than to other business and personal loans.  The Defendant's claims regarding FMSB's alleged misapplication of their payments under the 1999 loan did not raise constitutional defects that the Defendant was required to cure.  *See Vincent v. Bank of America, N.A.,* 109 S.W.3d 856, 852 (Tex. App. – Dallas 2003, pet. den.).  Moreover, if a lender makes an offer to modify or refinance an equity loan that complies with §50(a)(6)(Q)(x)(f), "a borrower's refusal to cooperate fully … does not invalidate the lender's protection for correcting a failure to comply." 7 TEX. ADMIN. CODE § 153.95 (effective November 11, 2004).  The Court, therefore, concludes that the Defendant's offer to cure the alleged violations of the Texas Constitution in connection with the 2004 home equity loan complied with §50(a)(6)(Q)(x) and that the Chambers' failure to cooperate with the Defendant did not invalidate the Defendant's attempted cure.

### B. Equitable Subrogation

Although the Court has determined that the 2004 loan agreement complied with the requirements of the Texas Constitution, the Court will address the Defendant's claim for equitable subrogation in order to provide the parties with a full discussion of the issues presented at trial.  In *LaSalle Bank National Association v. White*, 246 S.W.3d 616 (Tex. 2007), the Texas Supreme Court held that, to the extent the proceeds of a constitutionally invalid home equity loan are used to pay off constitutionally permissible

pre-existing liens, the home equity mortgagee is equitably subrogated to the prior lienholders' interests.  The Chambers argue that the Defendant is not entitled to equitable subrogation with respect to the 1999 loan because the 1999 loan, like the 2004 loan, was constitutionally invalid.

In an attempt to challenge the 1999 loan, Mr. Chambers testified at trial that the 1999 loan was actually a line of credit, which was not permitted under Texas law at that time.[21]   Home equity lines of credit were not authorized until 2003, when a new subsection (t) was added to §50(a)(6).[22]   The parties' Amended Joint Pretrial Order states that the 1999 loan was a home equity loan under Texas law.  Mr. Chambers' testimony regarding the legal characterization of the 1999 loan as a line of credit was not credible and contradicted the preponderance of the evidence submitted at trial as well as the parties' Amended Joint Pretrial Order.  *See* FED. R. BANKR. P. 7016.

The 1999 loan was, in fact, a home equity loan.  As previously discussed, the parties subsequently entered into a modification, renewal, and extension of the 1999 loan in November 2000.  "In Texas, the execution of an 'extension agreement' pertaining to an outstanding debt is generally treated as a new contract evidencing the existing debt." *Thompson v. Chrysler First Bus. Credit Corp.,* 840 S.W.2d 25, 29 (Tex. App. -- Dallas 1992, no writ).  However, where renewal notes or extensions are involved, the parties may sue either on either the renewal note or on the original note.  *See Villareal v. Laredo Nat'l Bank,* 677 S.W.2d 600, 607 (Tex. App. – San Antonio 1984, writ ref'd n.r.e.); *Smith*

---

[21] In their Amended Joint Pretrial Order, the parties stipulate that the 1999 loan was a home equity loan in the principal amount of $264,600.00.

[22] The new subsection (t) defines a home equity line of credit as "a form of open-end account that may be debited from time to time, under which credit may be extended from time to time…."

*v. First Pasadena State Bank,* 401 S.W.2d 123, 127 (Tex. App. – Houston [1st Dist.] 1966, no writ).

A claim that a home equity loan violates the Texas Constitution accrues on the date of closing. *See Rivera v. Countrywide Home Loan, Inc.*, 262 S.W. 3d 834, 841 (Tex. App. – Dallas 2008, no pet.). The applicable statute of limitations is four years. *Id.* at 841 (citing TEX. CIV. PRAC. & REM. CODE § 16.051 (when no corresponding action expressly listed within statutes, residual four-year statute of limitations applies)). *See also In re Ortegon*, 398 B.R. 431, 439-440 (Bankr. W.D. Tex. 2008) (following *Rivera*). Here, because the 1999 loan closed in August 1999, the Chambers had until August 2003 to advance their claims (assuming those claims retained any vitality after the loan extension and modification in November 2000). Nevertheless, the Chambers did not file their state court petition alleging violations of the Texas Constitution until December 6, 2006. The Court, therefore, concludes that the Chambers' claims regarding the 1999 home equity loan are barred by limitations.

Even if the Chambers' state court petition had been filed within the limitations period, the state court petition did not clearly provide the Defendant with notice that the Plaintiffs were seeking to establish that the 1999 home equity loan violated the Texas Constitution. The language of the Chambers' state court petition, as amended, and the Plaintiffs' adversary complaint, as amended, vacillates between references to a "loan" and "loans" without explanation. Furthermore, the factual allegations contained in the Chambers' state court petition and the Plaintiffs' adversary complaint relate solely to the 2004 home equity loan. The only loan specifically mentioned in the Chambers' state

court petition, as amended, and the First Amended Complaint is the 2004 home equity loan.

If the Chambers believed that FMSB had violated the Texas Constitution, they were required to notify FMSB of the alleged violation. Section 50(a)(6), which was enacted in 1997, allowed lenders to cure alleged violations of their obligations under the Texas Constitution. Prior to amendment by the Texas legislature in 2003, §50(a)(6)(Q)(x) provided as follows:

> The lender or any holder of the note for the extension of credit shall forfeit all principal and interest of the extension of credit if the lender or holder fails to comply with the lender or holder's obligations under the extension of credit within a reasonable time after the lender or holder is notified by the borrower of the lender's failure to comply.

TEX. CONST. art. XVI, § 50(a)(6)(Q)(x). The Texas Supreme Court interpreted this cure process in *Doody*.[23] Reading all of the amendments to §50(a) together, and considering them in light of each other, the Texas Supreme Court concluded that "section 50(a)(6)(Q)(x) is a cure provision that applies to all the lender's obligations under the 'extension of credit' …." *Doody*, 49 S.W.3d at 345. The Texas Supreme Court expressly held that "section 50(a)(6)(Q)(x) operates as authority to cure not only the particular lender obligation at issue under section 50(a)(6), but also to validate the lien." *Id.* at 347.

A lender who fails to comply with the requirements of §50(a)(6), and fails to cure any non-compliance upon receiving adequate notice from the borrower, does not have a valid lien under the Texas Constitution. *See* TEX. CONST. art. XVI, §50(e). In addition to

---

[23] In *Doody*, the lender charged the property owner closing costs in excess of three percent of the loan, in violation of section 50(a)(6)(E). The lender discovered its error and refunded the excess. Nonetheless, the property owner sued the lender, claiming that its failure to comply with the Texas Constitution rendered its lien on the homestead invalid. The Texas Supreme Court held that the lender had refunded the overcharges within a reasonable time and thereby validated its lien.

invalidating the lien, §50(a)(6)(Q)(x) provides that the lender "shall forfeit all principle and interest …."  The Texas Legislature envisioned this forfeiture of principle and interest as a penalty for violations of the constitutionally mandated requirements for home equity lending.  *See* House Committee Report for H.J.R. 31, Tex. 75th Leg, R.S. (1997).  Such forfeiture is *only* available for violations of constitutionally mandated provisions of the loan documents.  A lender's violation of any other provision of the loan documents results in traditional breach of contract causes of action, with traditional breach of contract remedies.  *See Vincent v. Bank of America, N.A.,* 109 S.W.3d at 862; *Galvan v. Centex Home Equity Co., L.L.C.,* 2008 WL 441773 at *5 (Tex.App. – San Antonio, Feb. 20, 2008, no pet.) (unpublished).

In this case, the Chambers did not specifically and clearly allege that the 1999 loan violated the Texas Constitution until their March 25, 2008 letter to the Defendant – a few weeks before the trial of this adversary proceeding.  The Court has serious reservations about whether such notice would be considered reasonable by a Texas state court.  Moreover, it appears to the Court that the 1999 loan is valid on its face.

At trial, the Chambers and the Chapter 7 trustee contended that FMSB had violated the Texas Constitution by incorrectly applying the payments made by the Chambers with respect to the 1999 home equity loan.  The Plaintiffs also sought to establish a "violation of substantially equal payment requirements," as claimed in the March 25, 2008 letter to the Defendant.  *See* TEX. CONST. art. XVI, §50(a)(6)(L).  The Plaintiffs and FMSB presented hours of testimony detailing the large, irregular payments made to FMSB by the Chambers and FMSB's bookkeeping practices.  Timothy Ray Smith, who is employed by the Defendant as Senior Vice President of Credit

Administration and Risk Management, testified at length regarding his audit of the payments applied to and the interest accrued on the 1999 home equity loan.

The Court finds, based on the evidence submitted at trial, that the 1999 home equity loan required periodic payments in compliance with §50(a)(6)(L) of the Texas Constitution.   The Chambers simply did not comply with this requirement.   The Chambers, instead, made large, irregular payments to FMSB on their home equity and business loans.  The Plaintiffs' real dispute is not with the payment terms set forth in the home equity loan documents, but with how FMSB applied the payments the Chambers occasionally made to FMSB.  As previously discussed, however, the forfeiture provision of §50(a)(6)(Q)(x) is inapplicable to an alleged breach of the loan documents.  *See Vincent v. Bank of America, N.A.,* 109 S.W.3d at 852.  The Plaintiffs failed to provide this Court with any authority that would support an elevation of their dispute with FMSB regarding its application of their payments on the 1999 loan to a violation of the Texas Constitution.  The Court, therefore, concludes that the 1999 home equity loan did not involve "payments applied to other loans -- violation of prohibition of cross-collateralization" as described in their March 25, 2008 letter to the Defendant.  *See* TEX. CONST. art. XVI, §50(a)(6)(H).

## IV. CONCLUSION

For the foregoing reasons, the Court concludes that the Plaintiffs' claims in their First and Second Causes of Action should be denied to the extent the Plaintiffs seek to invalidate the Defendant's lien on the Chambers' homestead on constitutional grounds or to recover payments the Chambers have made on their home equity loans.  The Court expresses no opinion on whether the Defendant's lien is void or avoidable or may be

invalidated on some other ground.  In light of the numerous remaining issues between the

parties, which the Court is remanding to state court, the Court further finds that it would

be premature to address the Defendant's claim for its attorneys' fees. The Court will enter

a Judgment consistent with this Memorandum Opinion.


Signed on 9/30/2009

*Brenda T. Rhoades*      SR
_____

HONORABLE BRENDA T. RHOADES,
UNITED STATES BANKRUPTCY JUDGE